**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BONNIE LYNN STANTON, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-5541 |
| | : | |
| V. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | **OPINION** |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Appearances:
For Plaintiff:
BRUCE D. ZEIDMAN
COSKY & ZEIDMAN
ATTORNEYS AT LAW
209 HADDON AVENUE
HADDONFIELD, NJ 08033

For Defendant:
VERNON NORWOOD
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
26 FEDERAL PLAZA
ROOM 3904
NEW YORK, NY 1027

**WOLFSON, District Judge**

Plaintiff Bonnie Lynn Stanton ("Plaintiff" or "Stanton") appeals from the final decision of the

Commissioner of Social Security, Jo Anne B. Barnhart ("Defendant" or the "Commissioner"), denying

her a closed period of disability benefits under the Social Security Act ("Act"). The Court has

jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). Plaintiff seeks a ruling that she was

disabled during the closed period from January 13, 2002 through July 12, 2003, and thus is entitled to

benefits.  Specifically, Plaintiff contends that the Administrative Law Judge, Christopher K. Bullard (the "ALJ"), erred by (1) concluding that Plaintiff was "not disabled" without the support of substantial evidence, (2) failing to properly determine whether Plaintiff's condition met the criteria of a listed impairment, (3) failing to appropriately determine Plaintiff's residual functional capacity, (4) failing to give appropriate probative value to relevant medical opinions, (5) improperly discounting Plaintiff's testimony, and (6) improperly considering the Vocational Expert's ("VE") testimony.  In addition, if the Court does not reverse the Commissioner outright, but instead, remands the case for reconsideration and clarification, Plaintiff is seeking a ruling from the Court that additional evidence that she has submitted is new and material and, as such, must be considered by the Commissioner. For the reasons stated below, the Court finds that the decision of the Commissioner is supported by substantial evidence in the Record and is therefore affirmed.

## I.  BACKGROUND

### A.  Plaintiff

Plaintiff was thirty-four years old at the onset of her alleged disability and is currently thirty-eight years old.  Admin. R. at 100.  She is a high school graduate and completed two years of college. Id. at 97.  Plaintiff also earned a degree in auto mechanics from Lincoln Technical Institute.  Id.  She alleges that she was disabled during the closed period of January 13, 2002 through July 12, 2003, when she returned to work.  Id. at 69.  Plaintiff states that she was unable to work due to surgeries to her knees and ankles that were necessitated by her osteoarthritis and by an osteochondral injury.  Id. at 59, 91.

### B.  Medical History

1.  Plaintiff's Medical History as Outlined the Administrative Record

On February 1, 2001, Dr. Joseph V. Donnelly, a podiatrist, performed surgeries on Plaintiff's left and right feet for plantar fasciitis and tendinitis. Id. at 140, 145, 176. Following these surgeries, Plaintiff took oxycodone, a narcotic pain medication that made her depressed, made it difficult to concentrate, and limited her ability to drive. Id. at 33, 34.

Plaintiff visited Dr. Christopher T. Born on August 1, 2001 as a result of pain that she was feeling in her right knee. Id. at 145. Plaintiff reported to Dr. Born that she felt instability in her knee, got occasional swelling and had "pain with stair climbing and sitting in a flexed position, such as a car." Id. Dr. Born examined Plantiff and found that she had joint line tenderness, very mild effusion, equivocal McMurray maneuver and some mild calf tenderness, but that she had no erythema and appeared to be grossly neurologically intact. Id. When Plaintiff saw him again on September 13, 2001, Dr. Born reported that his examination of Plaintiff's right knee revealed no warmth, heat or erythema, but that Plaintiff's MRI scan showed a focal injury to the medial femoral condyle of the right knee and a possible meniscus tear. Id. at 144. Dr. Born believed Plaintiff had an articular osteochondral injury to her right knee medial femoral condyle. Id.

Stanton testified that pursuant to Dr. Born's instructions, she stopped working on January 13, 2002 in order to prepare for another surgery. Id. at 32. On January 21, 2002, Dr. Born performed diagnostic arthroscopic surgery on Plaintiff's right knee. Id. at 132. The surgery revealed an osteochondral injury to the right medial femoral condyle, which Dr. Born shaved, debrided, and drilled. Id. at 142, 144. Plaintiff testified that she was using a walker immediately following the surgery and was then using crutches until approximately one month before returning to work. Id. at 43-44. Plaintiff testified that: 1) within two weeks of her surgery, she was able to shower herself, id. at 36; 2) within two months of her surgery she was able to wash dishes, id. at 18; 3) within five months she could drive short distances, id.; within six months she could do laundry and other chores,

3

id.; and, 5)  within eight months she could vacuum, id. at 45.  When Plaintiff visited Dr. Born on February 1, 2002, he recommended that Plaintiff start physical therapy and "some light, active passive ranges of motion and strengthening," and weight-bearing activities as tolerable.  Id. at 142.  On March 1, 2002, Dr. Born concluded that Plaintiff probably suffered from osteoarthritis.  Id. at 140.  Plaintiff also had begun taking Zoloft to combat her depression.  Id. at 34.

From March 8, 2002 through May 3, 2002, Plaintiff attended physical therapy sessions at Orthopaedics at Woodbury.  Id. at 147-71.  At her first sessions, Plaintiff reported that she felt continued pain and discomfort, id. at 164-67; however, the notes from later sessions reveal that Plaintiff's right knee progressed slowly and steadily, her lower extremity strength had improved, id. at 148, her pain and discomfort had decreased, id. at 149, and her therapeutic endurance had increased, id. at 151.

Plaintiff continued to have discomfort in both knees and saw Dr. Born again on April 5, 2002.  Id. at 137-38.  His examination of her right knee and her ankles revealed no warmth, heat or erythema, mild tenderness, and full range of motion in her ankle.  Id. at 137.  The x-rays of her ankles were "essentially negative" because they showed no obvious chondral injuries, fractures, lytic or blastic legions.  Id.  Dr. Born's impression of Plaintiff's condition was "[s]tatus post right knee arthroscopy with left knee pain, probably secondary to osteoarthritic changes, and bilateral ankle pain, probably secondary to arthritis."  Id.  Dr. Born suggested that Plaintiff visit a rheumatologist, continue physical therapy for her right knee, and, if possible, start an aquatic program.  Id. at 137-38.

On April 18, 2002, Dr. Sheldon D. Solomon, a rheumatologist, saw Plaintiff for a one-visit consultation, at which he concluded that Plaintiff did not have rheumatoid arthritis.  Id. at 94, 133-34.  Dr. Solomon determined that Plaintiff was massively obese and had "lumbar

4

lordosis with a full range of motion" and bilateral degenerative arthritis of her knees with secondary pitting edema.  Id.  He found "no evidence of inflammatory arthropathy."  Id. Dr. Solomon recommended a weight reduction program, water exercises, and continued care from Dr. Donnelly and Dr. Born.  Id.

On June 6, 2002, Plaintiff visited Dr. Tursi, an associate of Dr. Donnelly.  Id. at 174, 176. Dr. Tursi proposed that Plaintiff undergo an arthroscopic ankle arthroplasty; Plaintiff had this procedure performed on her left ankle on July 22, 2002, and on the right ankle on December 9, 2002.[1]  Id. at 46-47, 175.  On June 7, 2002, Dr. Tursi completed a General Medical Report regarding Plaintiff, and wrote that an x-ray had shown severe degenerative joint disease in Plaintiff's ankle joints.  Id.  at 174-75.  Dr. Tursi also diagnosed Plaintiff with bilateral ankle joint arthritis.  Id. at 175.

On September 9, 2002, Dr. Udomsaph, an independent medical consultant, completed a Physical Residual Functional Assessment of Plaintiff at Defendant's request.  Id. at 177-84.  Dr. Udomsaph was instructed to base his conclusions on a review of all the evidence in the file.  Id. at 177.  He determined that Plaintiff's symptoms could be attributed to medically determinable impairments and that the effects of these impairments were consistent with the medical evidence.[2]  Id. at 182.  He also determined that Plaintiff had the following exertional limitations: 1) she could lift up to twenty pounds occasionally, 2) lift ten pounds frequently, 3) stand or walk for at least two hours in an eight hour work day, 4) sit for six hours of an eight hour workday, and 5) do an unlimited amount

---

[1]  Plaintiff testified at the hearing before the ALJ that it was her right ankle that was operated on in July, 2002 and her left in December, 2002.  Admin. R. at 46.  However, this is contradicted by the medical evidence in the record; it appears as though Plaintiff simply confused the dates of the two procedures.

[2] Plaintiff argues in her brief that this evaluator, an orthopedist, was not aware of either of her ankle surgeries, nor was he aware of the fact that she expected to have surgery on her right knee.  Pl.'s Br. at 7.

of pushing and pulling.  Id. at 178.  Plaintiff's postural limitations implied that she could only

occasionally climb ramps or stairs, balance, stoop, kneel, or crouch.  Id. at 179.  Dr. Udomsaph found

no manipulative, id. at 180, visual, id., or communicative limitations, id. at 181, and found that

Plaintiff's knees had a full range of motion and were functional with only mild pain, id. at 182.[3]

On January 24, 2003, J. Theodore Brown, Jr., Ph.D., an independent consulting psychologist,

completed a psychiatric evaluation of Plaintiff that included an in-person examination.  Id. at 185-88.

Dr. Brown diagnosed Plaintiff as having an Axis I adjustment disorder with mixed anxiety and

depressed mood and an Axis III diagnosis of osteoarthritis and diabetes.  Id. at 187.  Dr. Brown ruled

out a diagnosis of major depressive disorder without psychotic features, but he deferred making an

Axis II diagnosis.  Id.  He also noted Plaintiff's poor gait.  Id. at 186.  Dr. Brown concluded that the

"[r]esults of present evaluation appear to be consistent with claimant's allegations."  Id. at 187.

---

[3]     Evidence that was submitted to the Appeals Council but not to the ALJ reveals
that Plaintiff visited Dr. Tursi again on November 14, 2002; Dr. Tursi noted that
Plaintiff "related [that] the left ankle felt great at this time, but that the left arch and
right arch and ankle continued to produce pain.  This discomfort continued to inhibit
normal ambulation and weight bearing activities."  Id. at 261.  Dr. Tursi also noted that
neither narcotic pain medications nor ankle splints had been effective.  Id.  He
diagnosed Stanton with right ankle arthralgia, and Plaintiff decided to undergo
arthroscopy surgery on her right ankle , which was the same type of procedure Plaintiff
had previously undergone on her left ankle.  Id. 47, 261.  Dr. Tursi performed the
surgery without incident on December 9, 2002.  Id. at 261.
        This new evidence also reveals that Plaintiff visited Dr. Tursi for several follow-up
visits after her surgery, during which time Plaintiff "admitt[ed] significant improvement of
her right ankle."  Id. at 261.  Dr. Tursi advised Plaintiff to perform weight-bearing activities
to the extent that she could tolerate them.  Id.  He also found that the "neurovascular status
to the right lower extremity remained satisfactory," the "surgical sites were healing within
normal limits," and that "[a]nkle range of motion was good and pain-free."  Id.  Dr. Tursi
concluded that it is his "medical opinion, with a degree of medical certainty, that Ms.
Stanton's bilateral foot and ankle deformities, and their necessitated medical and surgical
treatments, were directly related to and as a result of working for extended periods of time
on her feet as a cashier."  Id.

At the time of Dr. Brown's evaluation, Plaintiff exhibited a variety of psychological and cognitive symptoms.  Plaintiff complained of difficulty sleeping, appetite and weight loss, fatigue, memory and concentration problems, and a variety of other depressive and anxiety related symptoms. Id. at 185.  Dr. Brown noted that Plaintiff had mildly impaired recent and remote memory skills as a result of her emotional distress that could itself possibly have been a side-effect of her medications. Id. at 186.  However, Plaintiff's attention and concentration were intact.  Id.  Dr. Brown found that Plaintiff was not impaired in her ability to dress, bathe, and groom herself and was capable of cooking, cleaning, doing laundry, shopping, limited driving, and managing money.  Id.  Plaintiff testified later that she would fall asleep during television shows and would have trouble reading because she could not remember where she was on the page.  Id. at 37.

Dr. Brown stated that Plaintiff's prognosis was "[f]air, given claimant is provided with recommended resources and is compliant with the same." Id. at 187.  Dr. Brown determined that Plaintiff could follow and understand simple directions, perform simple rote tasks consistently, and perform complex tasks independently.  Id. at 187.  However, her ability to relate to others and deal with stress may have been compromised as a result of her poor retention and concentration.  Id.  Dr. Brown recommended that "[c]laimant should receive individual psychological therapy, vocational training, rehabilitation, [and] medical follow-up and evaluation." Id.

On February 3, 2003, Dr. M. Apacible, a state agency medical consultant, completed a Mental Residual Functional Capacity Assessment of Plaintiff.  Id. at 189-206.  Although he noted Plaintiff's poor gait due to arthritis, Dr. Apacible noted that Stanton "has a sever [sic] impairment, but she is capable of simple, light work type exertion and is not found to be disabled." Id. at 191.  He also stated that Plaintiff is "[a]ble to do [her] own adl's, cooks, cleans, laundry, manage $ [sic]."  Id.  Dr. Apaccible determined that Plaintiff had a mild memory impairment resulting from her emotional

distress, and that she was moderately limited in her ability to remember detailed instructions and ability to maintain attention and concentration for extended periods.  Id. at 189, 191.  Dr. Apacible also concluded that Plaintiff had mild difficulties in maintaining social functioning.  Id. at 203.

2.  Medical Evidence Considered By the Appeals Council But Not By the ALJ[4]

On March 7, 2003, Dr. Frederick C. Balduini, a doctor at the South Jersey Sports Medicine Center, started Plaintiff on Hyalgan therapy for her right knee to help her "moderately advanced aosteoarthritis."  Id. at 265.  On March 18, 2003, Dr. Balduini wrote a prescription stating, "Ms. Stanton has advanced arthritis of bilateral knees and should avoid jobs or activities that involve prolonged standing."  Id. at 272.

On April 16, 2003, Dr. Peter Blumenthal, a certified independent medical examiner, interviewed and examined Plaintiff.  Id. at 257-60.  Dr. Blumenthal found that Plaintiff was "considerably overweight with 10-degree valgus deformities of both knees."  Id. at 258.  Dr. Blumenthal concluded that Plaintiff had osteoarthritis in both her knees and her ankles.  Id. at 259.  He did not believe Plaintiff's work at ACME caused or accelerated Plaintiff's disability.  Id.[5]

3.  Medical History First Submitted at the District Court Level[6]

On February 19, 2003, Dr. Balduini wrote to Dr. Gehring describing Plaintiff's medical history, her current condition, and his prognosis of her.  Id. at 273-77.  Dr. Balduini described the treatments Plaintiff had already undergone, and noted the oral anti-inflammatories Plaintiff had tried.

---

[4] Plaintiff presented this evidence for the first time to the Appeals Council; it has been officially accepted as part of the Administrative Record, but it was not considered by the ALJ when he reached his decision.  The Appeals Council considered this evidence when it affirmed the ALJ.

[5] A number of medical reports that were written subsequent to the close of the disability period were also included within the evidence submitted to the Appeals Council.  They are not relevant here.

[6] Plaintiff presented this evidence for the first time at the District Court level; it has not been officially accepted as part of the Administrative Record.

Id. at 274.  He also noted that Plaintiff was moderately obese and ambulated poorly, id. at 274-75, but explained that Stanton "is not utilizing assistive devices for walking, namely canes or walkers or such."  Id.  Dr. Balduini also discussed the possibility that Plaintiff had osteochondritis dissecans or fibromyalgia.  Id. at 275-76.  Finally, Dr. Balduini explained Plaintiff's treatment options and suggested that she lose weight through Weight Watchers, start an aquatic exercise program, and start receiving Hyalgan injections in her knee.  Id. at 276-77.

Plaintiff underwent three sessions of Hyalgan therapy for her right knee in March, 2003.  Id. at 278-80.  Two months later, in May, 2003, Plaintiff underwent three sessions of Hyalgan therapy on her left knee. Id. at 280-282.  On June 27, 2003, Plaintiff returned to Dr. Balduini for a follow-up visit, at which he noted that the Hyalgan injections seemed to have been beneficial and that Plaintiff was doing "pretty well" and had "gotten her life under control."  Id. at 283.

### C.  Vocational History

Plaintiff's worked at Taco Bell and Kentucky Fried Chicken before becoming a full-time McDonald's employee[7] from February, 1987, through June, 1988, and again from 1989 to 1991.  Id. at 53, 104.  At McDonald's, Plaintiff worked as a cook at the grill, a counter worker, and as a drive-through worker.  Id.  Her job required that she walk and stand for six to eight hours per day, engage in some stooping, crouching, climbing and kneeling.  Id. at 105.  While working, Plaintiff frequently lifted items weighing twenty-five pounds or less and occasionally lifted items weighing fifty pounds. Id.  She left McDonald's in 1992 when she became pregnant and because of her "diabetes and other problems." Id. at 52.  Plaintiff did not work from 1992 to 1993.  Id. at 92.

---

[7] Plaintiff worked between seven and eight hours per day and five or six days per week. Id. at 107.

From September of 1988 to 1989, Plaintiff worked full-time at the Red Eagle Potatoes Plant, where she weighed and bagged potatoes. Id. at 104, 106. The job required standing for about seven and a half hours per day, stooping, kneeling, crouching, and lifting objects of up to fifty pounds on a frequent basis. Id. Plaintiff worked full-time at Wendy's from 1993 until 1995. Id. at 104, 109. She worked at the grill, the salad bar, the drive-thru window, and the counter. Id. at 52. The job involved lifting more than fifty pounds on a frequent basis, as well as kneeling, crouching, and standing for seven and a half hours per day, while sitting for only thirty minutes. Id. at 109. Plaintiff also worked as a supervisor at Wendy's for a period of about eight months. Id. at 52.

From November, 1995, until January 13, 2002, Plaintiff worked at ACME as a general clerk. Id. at 40, 92. Plaintiff described her job duties as follows:

> We pushed carts, maybe like five, six carts, four carts. You couldn't have less than four, and we bagged people's groceries and helped them carry out, you know, stuff that like if they're older they couldn't carry out like - - whatever they needed help in. We lift big whatever you call dog food bags, cases of soda. We did bagging. We did lifting that. We cleaned bathrooms. Cleaned, you know, we walked down the steps and swept them.
> Id. at 38-39.

Plaintiff stated that the job required her to occasionally lift a hundred pounds or more and frequently lift fifty pounds or more. Id. at 92. The job also required stooping as well as walking or standing for between four and six hours a day. Id. at 110. Stanton also testified that, pursuant to the instructions of Dr. Born, she left her job at ACME approximately a week prior to her first knee surgery. Id. at 32.

Plaintiff is currently employed by the Deptford Board of Education, for whom she started working in July, 2003. Id. at 35, 40. Plaintiff works five days a week from 3:00 pm to 11:30 pm. Id. at 40. Assistance is available for Plaintiff when the job requires her to lift anything. Id. at 42. Plaintiff described her duties as follows:

> I clean the rooms, classrooms. We wipe chalkboards off, and you run a dust mop under the desk and everything. There's no lifting. You go under with it and dust the room, and

sometimes you might have to mop the room, and if it isn't a chalkboard you get the marker boards . . . and empty trash.  That's it.
Id. at 40.

**D.  Procedural History**

Plaintiff submitted a Disability Report to the Social Security Administration on May 6, 2002.  Id. at 90-99.  In the Report, Plaintiff explained that she had been unable to work since January 13, 2002, due to the surgeries she had performed on her knees and ankles as a result of her osteoarthritis and osteochondral injury.  Id. at 91.  According to Plaintiff, her ability to work was limited by her pain and because she "can't stand long time [sic] on [her] legs or bend down to pickup things or lift heavy or medium stuff."  Id.  Plaintiff filed an application for Disability Insurance Benefits and for Supplemental Security Income on May 20, 2002.  Id.  at 80, 211.  Plaintiff also submitted a Work History Report on June 8, 2002.  Id. at 104-111; see supra § II(C) (describing Plaintiff's vocational history).

On June 9, 2002, Plaintiff signed and dated a Pain Report.  Id. at 112-19.  Plaintiff described the continuous osteoarthritis pain in her knee, ankles and lower and upper back, as well as the pain in her ankles.  Id. at 113, 115.  Plaintiff explained that, as a result of her pain, she could no longer stand or walk for long periods, id. at 113, she could not stand to do dishes, id. at 115, and she was limited in her bending, id. at 117.  Plaintiff indicated that ice, id. at 114, elevation, id., staying off of her feet, id. at 116, soaking her feet in a foot spa, id. at 114, and pain medication helped her pain somewhat, id.   According to Plaintiff, her knee pain worsens when she is "on it for long time or if it is raining out or [she doesn't] do [her] knee exercises given by the Doctor."  Id. at 115.

The Social Security Administration denied Plaintiff's initial claim for disability benefits on September 9, 2002.  Id. at 61.  On that same day, a Physical Residual Functional Assessment

was completed.  Id. at 177-84; see supra § I(D).  On October 7, 2002, Plaintiff completed a Request for Reconsideration of the initial denial of benefits because she was "unable to work on a regular and/or sustained basis."  Id. at 62.  Plaintiff also completed a Reconsideration Disability Report on October 7, 2002. Id. at 120-27.  Plaintiff complained that the Notices of Reconsideration addressed neither her mental difficulties nor her diabetes. Id. at 122.  Plaintiff also indicated that Dr. Donnelly had advised her not to work.  Id.  Plaintiff claimed that her pain and depression had worsened since the time of her initial filing.  Id.  She explained, "I can no longer drive for more than short distances; I cannot walk or stand for more than 20 minutes at a time; I cannot sit for more than 15 or 20 minutes at a time.  Housework is limited to washing dishes, but I have to take breaks." Id.  Plaintiff stated, "I can't bend down to tie my shoes.  I can't take baths.  I have to take showers, because I can't get out of the tub.  Dressing and bathing take a very long time."  Id. at 123.

On January 24, 2003, Dr. Brown completed a Psychiatric Evaluation of Plaintiff.  Id. at 185-88; see supra § I(B)(1).  On February 3, 2002, Dr. Apacible completed a Mental Residual Functional Capacity Assessment of Plaintiff.  Id. at 189-206; see supra § I(B)(1).  On February 5, 2003, the Social Security Administration issued a Social Security Notice of Reconsideration regarding Disability Insurance Benefits and a Social Security Income Notice of Reconsideration - Disability, both affirming the denial of benefits.  Id. at 63-66, 216-219.  Both documents made clear that "based on [Stanton's] age of 35 years, education of 14 years, and your experience, [she] can perform light work . . . and a job in which [she] would have simple tasks."  Id. at 66, 219.

On February 12, 2003, Plaintiff submitted a Disability Determination and Transmittal form.  Id. at 60.  Plaintiff wrote that her primary diagnosis was "osteoarthrosis and allied

disorders with a secondary diagnosis adjustment disorder." Id.  The Social Security

Administration received Plaintiff's Request for Hearing by an ALJ on April 11, 2003.  Id. at 67.

On November 7, 2003, Plaintiff amended her claim for disability benefits so that it reflected a

closed period of time: January 13, 2002, through July 12, 2003.  Id. at 69.

On June 10, 2004, a hearing took place in Voorhees, New Jersey, before the Honorable

Christopher K. Bullard, the ALJ.  Id. at 25-58.  Plaintiff testified at the hearing and described her

medical history in detail, including the four surgeries that she had performed on her feet, ankles,

and knees, and the effect that those surgeries had upon her.  Id. at 31-48.   She also testified that

she was unable to work during the closed period as a result of the surgeries.  Id. Mitchell Alan

Schmidt, a vocational case manager, testified as an impartial vocational expert ("VE") at the

June 10, 2004 hearing.  Id. at 49-57.  The VE classified Plaintiff's jobs in the fast food industry

as light-duty and unskilled.[8]  Id. at 54.  He opined that Plaintiff's work at ACME was a

combination of light-duty semi-skilled work and medium-duty unskilled work.  Id.  The VE

classified Plaintiff's current job at the Deptford Board of Education as medium-duty unskilled,

but he suspected that Plaintiff's particular job was actually light-duty work.  Id.  The VE

concluded that Plaintiff's current work "exceeds the [Plaintiff's] physical limitation at the

standing and walking [sic]."  Id. at 56.

The VE analyzed the employment opportunities in Burlington, Camden, Gloucester, and

Salem Counties in New Jersey for someone of Plaintiff's age and educational level with

Plaintiff's physical and mental limitations.  Id. at 55.  During the Hearing, the VE was asked:

> Q.  In your opinion could an individual with those limitations perform any of the past
> relevant work that you've described for the Claimant?

---

[8]  According to the VE, the eight months that Plaintiff worked as a manager at Wendy's
was not "enough [time] to acquire the skills for that [position] to be considered a past
relevant job."  Admin. R. at 54.

A.  No.

Q.  Okay.  And that's because they all exceed the physical limitations for the hypothetical question.  Is that correct?

A.  Correct.

Q.  That's fine.

A.  And even though the job she described with the school cleaning job I believe just that it exceeds the physical limitation at the standing and walking.
Id. at 56.

The VE stated that there were sedentary and unskilled jobs that Plaintiff could perform even with her limitations, including a food and beverage order clerk, a weave defect charting clerk, and a call-out operator.  Id.  The VE noted that Plaintiff would not be employable if she could not work eight hours per day or could not have regular attendance.  Id. at 57.

On June 24, 2004, the ALJ issued a Notice of Decision--Unfavorable.  Id. at 11-22.  The ALJ affirmed that Plaintiff met the non-disability requirements of the Act and was insured for disability benefits through the date of the ALJ's Notice of Decision.  Id. at 15.  Although Plaintiff's impairments were "severe"[9] and she did not engage in any substantial gainful activity during the period from January 13, 2002 through July 12, 2003, the severity of her impairments was not sufficient to meet the requirement that the impairment be listed in or be equivalent to an impairment listed in the Act.  Id. at 21; see 20 C.F.R. Pt. 404, Subpt. P, App.1.  The Notice of Decision also indicated that Plaintiff's work skills were not transferable to other employment within her Residual Functional Capacity ("RFC"), and that Plaintiff was unable to perform any of her past relevant work during the period in question.  Id.  Nonetheless, the ALJ determined

---

[9]  The ALJ found that Plaintiff's osteoarthritis of the knees and ankles, obesity, and depression were severe impairments, while her diabetes was simply mentioned as an impairment.  Admin. R. at 16.

that Plaintiff was not disabled within the meaning of the Act, see 20 C.F.R. §  404.1520, and

within the framework of the Medical-Vocational Rules, see 20 C.F.R. Pt. 404, Subpt. P, App. 2 §

201.28, because there was still a significant range of sedentary jobs available to someone of her

age, education, work experience and residual functional capacity.  Id. at 20-21.  The ALJ also

explained that he found Plaintiff's testimony regarding her inability to work during the period in

question to be less than credible.  Id. at 18.

On August 30, 2004, Plaintiff submitted a Request for Review of Hearing Decision/Order

to the Social Security Administration Office of Hearings and Appeals.  Id. at 9.  This request had

an enclosure with additional medical evidence that had not previously been included in the

Record.  Id. On September 16, 2004, Plaintiff's request for a review of the ALJ's June 24, 2004,

Notice of Decision was denied because Plaintiff's case did not fall under any of the acceptable

reasons for review.  Id. at 4.  Although Plaintiff provided additional evidence, the Notice of

Decision stated that the new evidence was not sufficient to change the decision rendered by the

ALJ.  Id. at 4-5.  Thus, the ALJ's decision became the final decision of the Commissioner of

Social Security.  Id. at 4; Admin. R. at 22.

On November 10, 2004, Plaintiff, through counsel, filed an appeal of the Commissioner's

decision with this Court.  Pl.'s Br. at 4.  An Answer was filed on January 14, 2005, on behalf of

the Commissioner.  Id.  On March 14, 2005, additional medical evidence was supplied to the

Office of General Counsel.  Id.   Defendant acknowledged receipt of this additional information,

but noted that it was not part of the official Administrative Record.  D.'s Br. at 9.

## II.  DISCUSSION

### A.  Standard of Review

When the Commissioner's factual decisions are supported by "substantial evidence" in the record, the Court must uphold those decisions.  42 U.S.C. § 405(g).  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see also Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001).  In evaluating whether "substantial evidence" existed to support the ALJ's decision, the Court must look only at the evidence that was before the ALJ.  United States v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).   However, a preponderance of the evidence is not essential for the Court to affirm the Commissioner's decision.  Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988).  When determining if there is substantial evidence to support a decision, the Court's review is "highly deferential." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir.2004).  When the evidence in support of each side is close, then the Commissioner's finding must be affirmed.  Hanusiewicz v. Bowen, 678 F.Supp. 474, 476 (D.N.J. 1988) (citing Toborowski v. Finch, 363 F.Supp. 717 (E.D. Pa. 1973)); see also Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir.1986).

### B.  Standard for Entitlement of Benefits

A plaintiff must demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not

less than twelve months." 42 U.S.C. § 423(d)(1)(A); see Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Disability insurance benefits may not be paid under the Act unless the plaintiff first meets the statutory insured status requirements.  42 U.S.C. § 423(c).

The Act establishes a five-step sequential process for an ALJ's evaluation of whether a person is disabled and entitled to Social Security Disability ("SSD") payments.  20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he is not currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5 (1987).  A claimant currently engaged in substantial gainful activity is automatically denied disability benefits.  20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a Asevere impairment or combination of impairments that significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146-47 n.5.  Basic work activities relate to the abilities and aptitudes necessary to do most jobs.  20 C.F.R. § 404.1521(b).  These activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling.  Id.  A claimant who does not have a severe impairment is not disabled.  20 C.F.R. § 404.1520(c); see Plummer, 186 F.3d at 428.  Third, if the impairment is found to be severe, the ALJ determines whether the impairment meets or is equal to those impairments listed in the list of impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant demonstrates that his impairments are equal in severity to or meet those in the list of

impairments, the claimant has satisfied his burden of proof and is automatically entitled to

benefits. 20 C.F.R. § 404.1520(d); see also Bowen, 482 U.S. at 146-47 n.5. If the claimant is

not conclusively disabled under the criteria set forth in the list of impairments, step three is not

satisfied, and the claimant must prove at step four whether he retains the RFC to perform his past

relevant work. 20 C.F.R. § 404.1520(d); Bowen, 482 U.S. at 141. If the claimant is able to

perform his previous work, the claimant is determined not to be disabled. 20 C.F.R. §

404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42. The claimant bears the burden of

demonstrating an inability to return to past relevant work. Plummer, 186 F.3d at 428. Finally, if

it is determined that the claimant is no longer able to perform his previous work, the burden of

production then shifts to the Commissioner to show, at step five, that the "claimant is able to

perform work available in the national economy." Bowen, 482 U.S. at 146-47 n.5; Plummer,

186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and

past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of

all the claimant's impairments in determining whether the claimant is capable of performing

work and thus is not "disabled." Id.

### C.  The Administrative Law Judge's Decision

The ALJ determined in a June 24, 2004, decision that Plaintiff was not "disabled" under

the Act during the closed period of January 13, 2002 through July 12, 2003. Admin. R. at 22.

The ALJ concluded that Plaintiff had  "severe" impairments, but that they were not sufficiently

severe to meet the definition of "disabled" under the Act. Id. at 21-22. The ALJ found

Plaintiff's statements to be "not entirely credible," and concluded that there were a significant

number of sedentary and unskilled jobs available to Plaintiff during the closed period. Id. at 18,

22. Therefore, the ALJ concluded that Plaintiff was not "disabled" under the Act and thus was

not eligible for compensation from Disability Insurance Benefits or from Supplemental Security

Income.  Id. at 22.

The ALJ made the following findings at the conclusion of his opinion:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant did not engage in substantial gainful activity during the period from January 13, 2002 to July 12, 2003.

3. The claimant's osteoarthrisits of the knees and ankles, status post arthroscopy of the right knee, status post ankle debridement bilaterally, obesity, and depression are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations, during the period from January 13, 2002 through July 12, 2003, are not totally credible for the reasons set forth in the body of the decision.

6. During the period from January 13, 2002 through July 12, 2003, the claimant had the following residual functional capacity: to lift and carry up to ten pounds occasionally and less than ten pounds frequently, sit for about six hours, stand for about two hours and walk for about one hour in an eight hour workday, but who could only occasionally climb stairs, balance or stoop, and was only able to understand simple one or tow step instructions and perform simple, repetitive tasks.

7. The claimant was unable to perform any of her past relevant work during the period from January 13, 2002 through July 12, 2003 (20 C.F.R. §§ 404.1565 and 416.965).

8. The claimant was a "younger individual" during the period in questions (20 C.F.R. 404.1563 and 416.963).

9. The claimant has "more than a high school (or high school equivalent) education" (20 C.F.R. 404.1564 and 416.964).

10. The claimant has a semi-skilled work background; however, her skills are not transferable to other work within her residual function al capacity (20 C.F.R. §§ 404.1568 and 416.968).

11. During the period from January 13, 2002 through July 12, 2003, the claimant had the residual functional capacity to perform a significant range of sedentary work (20 C.F.R. §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations did not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there were a significant number of jobs in the national economy that she could have performed during the period from January 13, 2002 through July 12, 2003. Examples of such jobs include work as a food and beverage order clerk (880,000 jobs in the U.S. and 1,410 jobs in New Jersey); as a weave defect checking clerk (20,160 jobs in the U.S. and 220 jobs in New Jersey) or as a call out operator (318,000.00 jobs in the U.S. and 510 jobs in New Jersey), all these jobs as sedentary and unskilled.

13. During the period from January 13, 2002 through July 12, 2003, the claimant was not under a "disability" as defined in the Social Security Act (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

### D.  Plaintiff's Arguments on Appeal

1.  Listed Impairment

Plaintiff argues, inter alia, that the ALJ was incorrect when he determined that her

condition did not constitute a listed impairment.  In step three of the five-step procedure for

evaluating SSD claims, the ALJ must determine whether a claimant's impairments match or are

equivalent to one of the listed impairments.  20 C.F.R. § 404.1520.  Federal regulations make

clear the steps that ALJs must take in order to evaluate whether a plaintiff's impairments meet or

are medically equivalent to a listed impairment.  20 C.F.R. § 404.1526(a).  These regulations

provide:

> We will decide that your impairment(s) is medically equivalent to a listed impairment in appendix 1 if the medical findings are at least equal in severity and duration to the listed findings.  We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment.  If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal.  If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairment to determine whether the combination of your impairments is medically equal to any listed impairment.  Id.

Here, the ALJ determined that Plaintiff's condition was not medically equivalent to a listed impairment; therefore, he found, in effect, that her condition did not constitute an impairment listed under either Section 1 or Section 14.  Pl.'s Br. at 15; <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Section 1 describes conditions pertaining to the musculoskeletal system.  20 C.F.R. Pt. 404, Subpt. P, App. 1 at 1.00.  To be covered under this section, an impairment must result in a "functional loss," which is defined as "the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason."  <u>Id.</u> at 1.00(B)(2)(a).   The regulation defines "inability to ambulate effectively" as:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
> <u>Id.</u> at 1.00(B)(2)(b)(1).

Furthermore, to "ambulate effectively,"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.
> <u>Id.</u> at 1.00(B)(2)(b)(2).

Plaintiff's condition must fall under one of the specific categories of musculoskeletal impairments in Section 1 for Plaintiff to be constitute a listed impairment of the musculoskeletal system.  There are two categories of musculoskeletal impairments that are relevant to Plaintiff's case.[10]  The first of these provides:

> 1.02 Major dysfunction of a joint(s) (due to any cause):  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively.
> Id. at 1.02 (emphasis added).

The second relevant category provides:

> 1.03  Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively . . . and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.
> Id. at 1.03 (emphasis added).

In the alternative, Plaintiff contends that Section 14 regarding disorders of the immune system applies.  Pl.'s Br. at 15.  Plaintiff claims that her impairment falls under Section 14.09, which provides:

> 14.09  Inflammatory arthritis. . . . with one of the following:
> A.  History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements

---

[10]  In his Opinion, the ALJ does not identify any listed impairments that he believed Plaintiff's condition fell short of establishing. See Admin. R. at 16.  Plaintiff also does not specify the specific impairment that she believes is applicable to her condition.  Therefore, this Court, upon its review of the Administrative Record and while recognizing that it is not its place to make medical determinations, is applying Plaintiff's condition to the Section 1 listed impairments that it deems relevant here.

effectively, as defined in 14.00B6b[11] and 1.00B2b and B2c."  Id. at 14.09(A) (emphasis added).

Section 14 conditions differ from those covered by Section 1 because Section 14 provides: "When persistent deformity without ongoing inflammation is the dominant feature of the impairment, it should be evaluated under 1.02, or, if there has been surgical reconstruction, 1.03."  Id. at 14.00(B)(6).  Here, if Plaintiff has ongoing inflammation, then her impairment should be considered under Section 14; if Plaintiff does not have ongoing inflammation, then the impairment falls under Section 1.  Id.  at 14.00(B)(6).   Before making that determination, though, the Court notes that a requirement common to both Sections 1 and 4 is the "inability to ambulate effectively."  Therefore, as a threshold matter, Plaintiff must demonstrate all of the "specified medical criteria" associated with an "inability to ambulate effectively" in order to succeed in her claim.  See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (emphasis in original).

Here, the ALJ found that Plaintiff had diabetes, as well as the following severe impairments: osteoarthritis of the knees and ankles, status post arthroscopy of the right knee, status post ankle debridement bilaterally, obesity, and depression.  Admin. R. at 16.  However, he found that Plaintiff's impairments do not have a level of severity that meets any of the impairments listed.

Plaintiff does not contend that she has an "inability" to ambulate or any "extreme" limitation; she discusses only her "limitations on ambulation."  See Pl.'s Br. at 15.  Indeed,

---

[11] 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 14.00(B)(6)(b) provides: "The term inability to ambulate effectively and inability to perform fine and gross movements effectively in 14.09A have the same meaning as in 1.00B2b and 1.00B2c and must have lasted, or be expected to last, for at least 12 months."

Plaintiff's ambulatory "limitations" are supported by the reports of Dr. Born, Dr. Tursi, and Dr. Solomon as well as by Plaintiff's Mental Residual Functional Capacity evaluation and her physical therapy reports.  However, none of this evidence suggests that Plaintiff had an inability to ambulate effectively.  Moreover, Plaintiff's ability to carry out activities of daily living, such as bathing, shopping, cooking, cleaning, and driving suggest that Plaintiff did not possess "an extreme limitation of the ability to walk" or impairments that interfered very seriously with the her ability to independently initiate, sustain, or complete activities. Admin. R. at 187; see 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 1.00(B)(2)(b)(1).

The regulations also provide that if a person cannot ambulate "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," then that person has "ineffective ambulation,"  20 C.F.R. Pt. 404, Subpt. P, App. 1 at 1.00(B)(2)(b)(1), and they provide that a person's reliance on a walker or crutches is an example of ineffective ambulation, id. at 1.00(B)(2)(b)(2).  Here, while the ALJ did not discuss whether Plaintiff was able to "ambulate effectively" during the closed period, he ultimately determined that Plaintiff's medically determinable impairments did not meet or medically equal one of the listed impairments because "the examining physicians have not reported findings, which would be equivalent in severity to the criteria of any listed impairment."  Admin. R. at 16.  At the hearing before the ALJ, Plaintiff testified that she continued to use crutches during the closed period of disability, until about one month prior to returning to work.  Id. at 43-44. However, notwithstanding the lengthy Administrative Record here, there is no medical basis for this use of crutches provided within the Record, as required by the regulations.  Indeed, 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 1.00(J)(4), which is entitled, "Hand-held assistive devices," provides:

> When an individual with an impairment involving a lower extremity or extremities uses a
> hand-held assistive device, such as a cane, crutch or walker, examination should be with

and without the use of the assistive device unless contraindicated by the medical judgment of a physician who has treated or examined the individual. The individual's ability to ambulate with and without the device provides information as to whether, or the extent to which, the individual is able to ambulate without assistance. The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented. The requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling.

The new evidence that Plaintiff seeks to have considered under the mandates of <u>Matthews v. Apfel</u>, 239 F.3d 589 (3d Cir. 2001) further muddles the issue of Plaintiff's ability to ambulate, and it also puts her credibility in question because it contradicts some of her testimony, <u>see</u> <u>infra</u> § II(D)(3).

Matthews holds that, when a claimant seeking judicial review of the Commissioner's final decision seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner "but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ." 239 F.3d at 593.[12] Moreover, the materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the ALJ's determination. <u>Szubak v. Sec'y of HHS</u>, 745 F.2d 831, 833 (3d Cir. 1984).

---

[12] The Third Circuit explained the "sound public policy" underlying this rule:

> We should encourage disability claimants to present to the ALJ all relevant evidence concerning the claimant's impairments. If we were to order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand. .... Instead, we believe that it is a much sounder policy to require claimants to present all material evidence to the ALJ and prohibit judicial review of new evidence unless there is good reason for not having brought it before the ALJ. Such a holding is instrumental to the speedy and orderly disposition of Social Security claims. <u>Matthews</u>, 239 F.3d at 595 (internal citations omitted).

Included within the new evidence is a letter from Dr. Balduini to Dr. Gehring dated

February 19, 2003.  This letter provides a comprehensive summary of Plaintiff's medical history

along with candid impressions of her situation at the time the letter was written.  Admin. R. at

273-77.  In the letter, Dr. Balduini describes Plaintiff's ability to walk and stated that Stanton "is

not utilizing assistive devices for walking, namely canes or walkers or such," id. at 274, which

directly contradicts her own testimony.   While this letter has bearing on Plaintiff's ability to

ambulate and on her credibility, it only lends support to the ALJ's determination that Plaintiff

did not ambulate ineffectively and casts Plaintiff's credibility further in doubt.  Therefore, the

Court finds that there does not exist a reasonable possibility that this letter or any other piece of

new evidence would have changed the outcome of the ALJ's determination.[13]  Therefore, none of

this new evidence offered by Plaintiff warrants a remand.  Furthermore, the medical evidence

reveals that Plaintiff's condition had improved since her surgeries; her strength and endurance

increased, while her pain and discomfort decreased, this progress is evidenced by the fact that

she was able to engage in household chores, cooking, cleaning, driving, shopping and grooming

during the relevant period of time.  As a result, the evidence in the record substantially supports

---

[13]  The letter from Dr. Frederick Balduini to Dr. Gehring dated February 19, 2003 is the only piece of new evidence that even warrants consideration under Matthews. The material that was first presented to the Appeals Council, including records from Dr. Gehring, Dr. Tursi, Dr. Balduini, and the Laboratory Corporation of America as well as the results of an MRI, x-rays, and a Venous Doppler, provides medical details that support information already in the Record, but does not contain any new and substantive determinations or conclusions.  Besides the February 19, 2003 letter, the evidence submitted for the first time at the District Court level is either cumulative of evidence that is already contained in the Record, or not "material" because it has no "reasonable possibility" of altering the ALJ's decision.  This evidence includes six notes detailing Plaintiff's Hyalgan injections and to Plaintiff's knees and do not contain any additional information that could potentially be considered "material."  Id. at 278-82.  Another note describes a return visit to Dr. Balduini and also does not contain substantial "new" or "material" information, merely stating that Plaintiff was doing well on June 27, 2003, immediately before she returned to work.  Id. at 283.

the ALJ's determination that Stanton's impairments did not match and were not equivalent to one of the listed impairments.

### 3. Plaintiff's Residual Functional Capacity

Plaintiff also challenges the ALJ's finding regarding her Residual Functional Capacity ("RFC") and argues that the ALJ failed to articulate a sufficient rationale for discrediting Plaintiff's credibility.   Indeed, the ALJ has the responsibility of assessing a claimant's RFC.  20 C.F.R. § 404.1546(c).  In making this assessment, the ALJ must evaluate all relevant evidence in the case record, 20 C.F.R. § 404.1545(a)(1), and must "consider [Plaintiff's] ability to meet the physical, mental, sensory, and other requirements of work."  Id. at § 404.1545(a)(4).  The evaluation must include consideration of all "medically determinable impairments," including those that are not "severe." Id. at § 404.1545(a)(2).  In reaching an RFC determination, the ALJ must evaluate all relevant evidence, Fargnoli v. Massanari, 247 F.3d 24, 40-41 (3d Cir.2001), and explain his reasons for rejecting any such evidence. Burnett v. Commisioner of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir.2000). The Third Circuit requires that a plaintiff's subjective complaints be given "serious consideration," Mason. v. Shalala, 994 F.2d 1058, 1067 (3d Cir.1993); see also Burnett, 220 F.3d at 120; Cotter v. Harris, 642 F.2d 700, 704 (3d Cir.1981). An ALJ is required to assess a claimant's complaints of pain, but he may also consider factors such as the claimant's daily activities, measures the claimant uses to treat pain or symptoms, and credibility. 20 C.F.R. § 416.929(c)(3); see also Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981).  Moreover, while an ALJ must consider a claimant's subjective symptoms, including pain, the ALJ need only do so to the "extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529

Here, the ALJ found that, during the relevant time period, Plaintiff retained the RFC "to lift and carry up to ten pounds occasionally and less than ten pounds frequently, sit for about six hours, stand for about two hours and walk for about one hour in an eight hour workday, but ... could occasionally climb stairs, balance or stoop, and was able to understand simple one or two step instructions and perform simple, repetitive tasks." Admin. R. at 19. Moreover, while he considered Plaintiff's subjective complaints, he found that her testimony about her impairments lacked credibility; upon reviewing the entire record, including medical reports and Stanton's own testimony, the ALJ explained:

> The claimant's statements concerning her impairments and their impact on her ability to work during the period from January 13, 2002 through July 12, 2003 are not entirely credible in light of the claimant's own description of her activities and life style; the degree of medical treatment required; the reports of the treating and examining practitioners; her medical history as a whole. Admin. R. at 18.

Plaintiff argues that the ALJ violated Social Security Rule ("SSR") 96-8p in his assessment of her RFC. SSR 96-8p states that "the [residual functional capacity] is a function-by-function assessment based on all of the relevant evidence of an individual's ability to do work-related activities." Specifically, under this rule, the ALJ is required to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." SSR 96-8p. Moreover, such a discussion must be made by the ALJ in narrative form, "citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p.

The Tenth Circuit ruled the ALJ must "specify the evidence that he relied upon to support his [or her] conclusion" in order to meet the requirement of SSR 96-8p. Diggdon v. Apfel, 1999

WL 617702, *3, 1999 U.S.App. LEXIS 19248 at *8 (10th Cir. Aug. 16, 1999). In addition, this requirement is not satisfied by the ALJ's mere assertion that the residual functional capacity was based on the medical evidence. Id. Instead, SSR 96-8p requires the ALJ to cite specific medical facts that support his or her residual functional capacity determination. Southard v. Barnhart, 72 Fed.Appx. 781 at *784 (10th Cir. July, 28, 2003). If an ALJ fails to cite the specific medical facts that he relied on in making a residual functional capacity determination, the reviewing court may not make factual determinations on behalf of the ALJ. See Cox v. Apfel, 1999 WL 820215, *3, 1999 U.S.App. Lexis 25630 at *9 (10th Cir. October 14, 1999); see also Rapp v. United States Dep't of Treasury, 52 F.3d 1510, 1515 (10th Cir.1995) (stating that a reviewing court may not compensate for the deficiencies in an agency's decision "by supplying a reasoned basis for the agency's action that the agency itself has not given."). Although in Rinker v. Barnhart, another district court in this circuit concluded that an ALJ's mere consideration of the plaintiff's exertional impairments is sufficient to satisfy the requirements of SSR 96-8p, this Court is persuaded by and will follow the teachings of the Tenth Circuit as described above. See Rinker, 2004 WL 1527521, *5, 2004 U.S. Dist. LEXIS 11358 at *19 (E.D.Pa. May 28, 2004). To do otherwise would render SSR 96-8p meaningless.  Although it does not specifically address the requirements of SSR 96-8p, the Third Circuit caselaw is consistent with the Tenth Circuit's position on this issue. In Fargnoli v. Massanari, the court of appeals concluded that the ALJ's residual functional capacity assessment must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." 247 F.3d 34, 41 (3d Cir.2001). This type of explanation facilitates a meaningful judicial review and "helps to avoid judicial usurpation of administrative functions." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981).

When determining Plaintiff's RFC and that her testimony regarding her alleged inability to work during the relevant period lacked credibility, the ALJ cited and relied upon the following specific medical and non-medical evidence: 1) none of her surgeries "would have been expected to keep [Stanton] out of work for 12 months or more"; 2) "physical therapy notes indicate that by April 24, 2004, she had increased lower extremity strength and endurance, and had less pain and discomfort"; 3) "two months after her knee surgery she was able to wash the dishes"; 4) "six months after her knee surgery she was able to do the laundry, household chores, and drive her car"; 5) "she was able to dress, bathe and groom herself, do general cleaning, prepare and cook food, do the laundry and shop"; and 6) "her attention and concentration were intact," "her recent an remote memory skills were only mildly impaired," and "her thought processes were goal directed and coherent and her cognitive functioning was average."  Admin. R. at 19.  Because the ALJ supported his RFC determination with specific facts, the Court finds that SSR 96-8p is satisfied here.

Moreover, the reviewing court usually defers to the ALJ's determination of credibility because the ALJ had the opportunity during a hearing to assess the Plaintiff's demeanor.  See, e.g. Atl. Limousine, Inc. v. NLRB, 243 F.3d 711, 718 (3d Cir. 2001).  However, according to SSR 96-7P, the ALJ may not base a decision regarding credibility on "an intangible or intuitive notion about an individual's credibility." SSR 96-7P at 4.   Additionally, such deference does not extend to decisions without sufficient evidentiary support. See Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (stating that ALJ failed to explain discrediting certain evidence and not others).  The ALJ's decision must contain specific reasons for credibility findings, "supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements

and the reasons for that weight." <u>Schwartz v. Halter</u>, 134 F.Supp.2d 640, 654 (E.D. Pa. 2001) (quoting SSR 96-7P; <u>Schaudeck v. Comm'r of Soc. Sec. Admin.</u>, 181 F.3d 429, 433 (3d Cir.1999)).  This Court is loath to overturn the credibility determinations of an ALJ who heard live testimony and provided specific reasons for questioning Plaintiff's credibility.  <u>See</u> <u>Irelan v. Barnhart</u>, 243 F. Supp.2d 268, 284 (E.D. Pa.2003) (quoting <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531 (6th Cir.1997) ("[The] ALJ is empowered to evaluate the credibility of witnesses, and his findings on the credibility of claimants 'are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.")), and as discussed above, the Court finds that the ALJ's determination of Stanton's RFC and his credibility determination are supported by substantial evidence.

### 4.  Medical Opinions

Plaintiff also argues that the ALJ failed to gave appropriate probative value to relevant medical opinions.  Indeed, the ALJ has an obligation to review all of the relevant evidence and provide an explanation for discounting any evidence that is rejected.  <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999).  If the evidence conflicts, the ALJ has the responsibility of deciding which evidence is credible, but the ALJ is obligated to provide a reason for dismissing evidence as lacking credibility.  <u>Id.</u>  Here, Plaintiff argues that there was "no discussion of Dr. Tursi" in the ALJ's opinion.  Pl.'s Br. at 21.  While the ALJ misspelled Dr. Tursi's name when he referred to him as "Dr. Turi," he dedicated an entire paragraph of his opinion to Dr. Tursi's findings.  Admin. R. at 17.  The ALJ also adequately discussed the opinions of Plaintiff's other treating physicians, Dr. Born and Dr. Solomon.  Admin. R. at 16-17.

Plaintiff also argues that the ALJ ignored certain notes from the physical therapy sessions that Plaintiff had undergone.  The ALJ mentions in his opinion that Plaintiff underwent physical

therapy from March 8, 2002 through May 3, 2002 and explains that the notes therefrom "show that [Plaintiff] made slow steady progress with her right knee." Admin. R. at 17. He specifically mentions Plaintiff's session on April 24, 2002, id., at which she "demonstrate[d] improvement in ... lower extremity strength, pain/discomfort relief, and therapeutic endurance." Id. at 151. Plaintiff argues that ALJ ignored notes from sessions at which Plaintiff complained that her symptoms had increased or worsened. Pl.'s Br. in Reply at 4-5. The specific notes that Plaintiff argues the ALJ ignored are from March, 2002 and the beginning of April, 2002, and, thus, were written shortly after Plaintiff began undergoing physical therapy. However, in order to ascertain the overall effect of the therapy, the ALJ's opinion primarily relies upon those notes written in late April, 2002 and early May, 2002, during Plaintiff's last two weeks of physical therapy. Id. at 17. Indeed, the notes from her sessions of April 26, 2002, April 29, 2002, May 1, 2002, and May 3, 2002, which were her final four sessions, indicate that Plaintiff reported lessened symptoms and had shown further improvement in her "lower extremity strength" and "pain/discomfort relief." Id. at 147-150. Therefore, the ALJ properly reviewed the physical therapy notes.

Plaintiff further argues that the ALJ failed to address discrepancies among the reports of examining physicians and those physicians who assessed Plaintiff's medical records but did not conduct an in-person examination. Pl.'s Br. at 19. Indeed, if conflict among medical evidence exists, the ALJ may choose whom to credit but must explain the reason for doing so. Plummer, 186 F.3d at 429. However, Plaintiff has failed to identify any conflict or discrepancy among the evidence that required any such explanation, nor can the Court identify one. Nowhere in the Record does one of Plaintiff's examining doctors specifically state that Plaintiff was "disabled"

or unable to work, nor does any doctor directly dispute the findings of another.  Therefore, the Court concludes that the ALJ gave appropriate probative value to relevant medical opinions.

     5.  Vocational Expert

Plaintiff also argues that the testimony of the Vocational Expert, which was relied upon by the ALJ, was flawed.  In the fifth step of the SSD analysis, the burden shifts from the Plaintiff to the Commissioner to "show that the claimant given [his or her] age, education and work experience, has the capacity to perform specific jobs that exist in the national economy." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  If an error occurs, the Court must determine whether the error was harmless.  If it is "highly probable" that a non-constitutional legal error did not affect the judgment, then the error is harmless.  Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 329 (3d Cir. 2001).  In making this determination, the Court must be "well-satisfied" that neither party was prejudiced by the error. Id.

When evaluating an SSD claim, an applicant's past relevant work is defined as work done within the past fifteen years.  20 C.F.R. § 404.1560(b)(1).  Because Section 404.1560 of the Act refers to how a disability claim will initially be assessed, its intent is to refer to the fifteen years prior to the initial claim rather than fifteen years prior to the present day.  The fifteen year period is used because a "gradual change occurs in most jobs so that after fifteen years it is no longer realistic to expect that skills and abilities required in a job done then continue to apply." 20 C.F.R. § 404.1565(a).

Here, prior to the June 10, 2004 Hearing at which the VE testified, the VE received a letter from the ALJ stating that his "testimony will primarily cover the following period: January 13, 2002 through the present."  Admin. R. at 71.  However, Plaintiff's claim is for a closed

33

period of disability, from January 13, 2002 through July 12, 2003.   At the hearing, the ALJ

asked the VE, if, in his opinion, there "would ... be other work, which exists in the regional or

national economy that an individual with [Plaintiff's] limitations could perform?"  Id. at 56.  The

ALJ phrased the question in the present tense, and it is entirely possible that the VE interpreted it

as such; however, as Plaintiff argues, a two-and-a-half-year gap exists between the onset of

Plaintiff's closed period of disability and the time of the Hearing.  In response, Defendant

explains that the VE was present for the entire hearing, and that earlier in the hearing, the ALJ

correctly stated the relevant time period.  Def.'s Br. at 21 (citing Admin. R. 29).  Defendant also

argues that the ALJ did not need to specify the relevant time period when presenting a

hypothetical to the VE because the focus of the hypothetical is the RFC.  Id. Even if the Court

assumes, arguendo, that Plaintiff is correct that an error occurred, this error is surely harmless,

since the gap in time was not a lengthy one, and, according to the VE, there were many jobs

available for Plaintiff.

Additionally, the ALJ asked the VE to "identify the work performed by the Claimant

during the past fifteen years."  Id. at 54.  However, since the closed disability period began on

January 13, 2002, the ALJ should have asked the VE to identify the work performed by Plaintiff

between January 13, 1987 and January 13, 2002.  As a result, the VE addressed Plaintiff's

current job as an industrial cleaner and neglected to address her employment between January

13, 1987 and June 10, 1989.   Theses errors are also harmless, though, since the industrial

cleaner job and Plaintiff's employment from January 13, 1987 through June 10, 1989, utilized

the same skills as those associated with her work experience between January 13, 1987 and

January 13, 2002.

Plaintiff also argues that the hypothetical posed by the ALJ to the VE during the June 10, 2004 Hearing was not sufficiently detailed because the ALJ did not make clear that a workday is eight hours long.  Id. at 55-56.  Indeed, when a Plaintiff's mental and physical limitations are combined to form the basis of a hypothetical, "great specificity" is required.  Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004).  Here, however, the hypothetical limitations that the ALJ provided to the VE in the hypothetical were highly detailed.  Moreover, when the ALJ told the VE to "[a]ssume this individual can stand for a total of two hours out of eight in the workday," Admin. R. at 55, he made clear that an eight-hour workday was the appropriate time frame under which to evaluate Plaintiff's capabilities.  See Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999) (determining that the hypothetical posed to the VE was appropriate although it did not include a direction that the plaintiff was unable to use her hands on demand).

Plaintiff also objects to the VE's reliance on the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") and to the lack of any specific cited source of information for the VE's statistics regarding employment availability in the region.  Pl.'s Br. in Reply at 10-11.  The DOT was last revised in 1991, Def.'s Br. at viii, and the VE relied upon it in order to determine the exertional and skill levels of Plaintiff's previous work experience.  Admin. R. at 54.  The VE's reliance on the DOT was appropriate because its use is specifically prescribed in the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 at 2.00.00(b) and the 1991 version was the applicable version.[14]  Therefore, the Court finds that the fifth step of the SSD analysis has been satisfied.

---

[14]  Plaintiff also objects to the fact that the New Jersey Department of Labor supplied the VE with area wage data, Admin. R. at 55, as opposed to a "national" source.  However, Plaintiff has identified nothing, nor can the Court find anything, that suggests that the New Jersey Department of Labor was an improper source of area wage data.

## III.  CONCLUSION

For the reasons set forth above, the Court finds that the Commissioner's decision is
supported by substantial evidence in the Record and is therefore affirmed.


Dated: December 20, 2005

S/ Freda L. Wolfson     
Honorable Freda L. Wolfson
United States District Court
